## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TARSUS CONNECT, LLC,

      Plaintiff/Counter Defendant,

            v.

CVENT, INC.,

      Defendant/Counter Plaintiff.

Civil Action No.
1:17-cv-05165-SDG

### <u>ORDER</u>

This matter is before the Court on Defendant/Counter Plaintiff Cvent, Inc.'s motion for summary judgment on Plaintiff/Counter Defendant Tarsus Connect, LLC's claims and Cvent's counterclaims [ECF 71], as well as Tarsus' motion for partial summary judgment on its own claims [ECF 149].[1] For the following reasons, Cvent's motion is **GRANTED** as to Tarsus' claims and **DENIED** as to Cvent's counterclaims; and Tarsus' motion for partial summary judgment is **DENIED**.

---

[1] The parties have also filed three motions for leave to file matters under seal [ECF 160; ECF 197; ECF 199] and a consent motion to redact the transcript of the parties' oral argument on the summary judgment motions [ECF 197]. For good cause shown, these motions are **GRANTED**.

## I. BACKGROUND

Unless otherwise noted, the following facts are not disputed by the parties or are supported by undisputed evidence in the record.[2] Tarsus is a "leading travel hospitality company that provides trade shows, corporate events, exhibitions and related goods and services throughout the United States."[3] Christopher Collinson serves as Tarsus' President.[4] Cvent is a "leading cloud-based enterprise event management company" that, among other things, "provides business networking opportunities and computer application training" in the fields of event planning, venue sourcing, marketing, and promotion.[5]

From 1974 until 2016, Tarsus operated under the legal name "Collinson & Company."[6] Tarsus also adopted different trade names during this period, including "Collinson Media & Events," "Collinson Publishing," and

---

[2]    In this Order, the Court refers to some information that the parties have filed under seal. The Court does not find that the information cited in this Order needs to be sealed, notwithstanding the parties' confidentiality designations.

[3]    ECF 21, ¶ 10. The Court notes that the legal entity Collinson & Company performed many of the relevant actions in this case. For the purposes of this Order, however, the Court will refer to Collinson & Company (including its various trade names) as "Tarsus."

[4]    ECF 159-3, ¶ 1 (SEALED).

[5]    ECF 26, at 2.

[6]    ECF 159-2, ¶ 1 (SEALED).

Collinson Media."[7] In 2007, Tarsus hosted an event entitled "Rejuvenate Marketplace," its first trade show.[8] After this show, Tarsus began hosting additional events it promoted under a variant of the "MARKETPLACE" moniker.[9] Tarsus' trade shows are "reverse style" events wherein suppliers (*e.g.*, hoteliers and conference destinations) visit booths hosted by meeting planners.[10] Tarsus' role is coordinating the appointments so that meeting planners and suppliers can successfully connect.[11] Tarsus prescreens and vets all prospective tradeshow meeting planners.[12]

In 2009, Tarsus first utilized the "connect" term when it published a magazine entitled "Connect Meetings Intelligence" and hosted its first "CONNECT Marketplace" trade show.[13] After the first "CONNECT Marketplace," Tarsus hosted a new event each year at a different location.[14]

---

[7]   *Id.* ¶ 2.

[8]   ECF 170, ¶ 5 (SEALED).

[9]   *Id.* ¶ 5.

[10]   *Id.* ¶ 20.

[11]   *Id.* ¶ 21.

[12]   *Id.* ¶ 22.

[13]   *Id.* ¶¶ 11, 19.

[14]   *Id.* ¶ 23.

On September 22, 2011, Tarsus applied for the registration of two trademarks with the United States Patent and Trademark Office ("USPTO"): "CONNECT" and "CONNECT MARKETPLACE."[15] Tarsus identified the services claimed in both marks as "organizing, promoting and conducting exhibits, tradeshows and events for business purposes."[16] During prosecution, the USPTO Trademark Examiner issued a 2(d) "likelihood of confusion" rejection for both marks, citing a mark already on the register.[17] Tarsus contested the rejection of both marks.[18] The Trademark Examiner accepted Tarsus' argument as to the "CONNECT MARKETPLACE" mark.[19] As such, on December 4, 2012, the USPTO issued Tarsus a trademark registration for "CONNECT MARKETPLACE."[20] On March 5, 2013, the Trademark Examiner issued a final likelihood of confusion

---

[15] *Id.* ¶ 55.

[16] *Id.* ¶ 56.

[17] *Id.* ¶¶ 62–63.

[18] *Id.* ¶ 64.

[19] *Id.* ¶ 65.

[20] *Id.* ¶ 66.

rejection on the "CONNECT" trademark application.[21] Tarsus did not contest this final rejection and abandoned the "CONNECT" application.[22]

Cvent began operating in 1999 as a registration software service provider.[23] Since 2000, Cvent has promoted and sold its services under the name Cvent, Inc.[24] Cvent sells three software products: (1) the hospitality cloud; (2) the event cloud for mid-market; and (3) the Cvent cloud for the enterprise space.[25] Prior to 2015, Cvent hosted various user technology conferences to promote and educate consumers on its products.[26] In 2014, Cvent debuted a mobile application entitled "CVENT CONNECT," which allowed customers to electronically view materials during seminars.[27] In late-2014, Cvent decided to combine its user conferences into

---

[21]  *Id*. ¶¶ 67–68.

[22]  *Id*. ¶ 69. Tarsus disputes that it "abandoned" the application, arguing that it believed "the trademark registration for CONNECT MARKETPLACE encompassed essentially the same scope as the applied-for CONNECT mark." *Id*. ¶ 70. This is not a material dispute, however, as Tarsus' subjective belief is immaterial and Tarsus elsewhere concedes it abandoned the application. ECF 159-2, ¶¶ 63–65 (SEALED).

[23]  ECF 170, ¶ 92 (SEALED).

[24]  ECF 159-2, ¶ 5 (SEALED).

[25]  *Id*. ¶ 66.

[26]  *Id*. ¶ 76.

[27]  *Id*. ¶ 77.

one larger conference.[28] On January 22, 2015, Cvent announced the introduction of its "CVENT CONNECT" user conference.[29] A portion of the "CVENT CONNECT" conference included a trade show networking event.[30]

While the parties dispute nearly all the specific facts, it is clear from the record that Cvent and Tarsus maintained a business relationship during this period. On February 29, 2012, Cvent and Tarsus entered into a multi-year contract whereby Tarsus agreed to, among other things, "[w]ork with Cvent to establish a Cvent-Sponsored Best practices webinar for attendees" of Tarsus' events.[31] On March 21, 2014, Cvent and Tarsus executed a second contract in which Tarsus agreed to "[w]ork with Cvent to establish 2 Cvent-Sponsored thought leadership webinars annually" for subscribers to Tarsus' events.[32] In accordance with these two contracts, Tarsus implemented Cvent's registration software, requiring

---

[28]   *Id*. ¶¶ 78–79.

[29]   ECF 26, at 2; ECF 159-2, ¶ 80 (SEALED). Tarsus makes much of its allegation that Cvent considered the name "Cvent Connect Marketplace" as an option for its rebranding. The parties dispute nearly all the relevant facts on this issue. Irrespective of the parties' disagreement, the Court finds that this dispute is immaterial; Cvent ultimately adopted the name "Cvent Connect" and never publicly used the "Marketplace" mark.

[30]   ECF 159-2, ¶ 82 (SEALED).

[31]   ECF 170, ¶ 94. *See also* ECF 159-27 (SEALED).

[32]   ECF 170, ¶ 96. *See also* ECF 159-29 (SEALED).

attendees of Tarsus' trade shows to register using that software.[33] Tarsus also promoted Cvent as a partner and encouraged its customers to use Cvent's software products.[34] Cvent sent a number of its employees to Tarsus' trade shows, including "Connect Marketplace" events.[35] For example, in 2012 and 2014, Cvent agreed to be a gold level sponsor of the "Connect Marketplace" trade show.[36] In 2013, Cvent upgraded its status to a platinum level sponsor.[37]

On January 11, 2016, Tarsus issued a press release announcing it would begin operating under the trade name "Connect Marketplace."[38] Tarsus introduced a new logo and website reflecting the name change.[39] Tarsus also renamed all of its "Marketplace" trade show events so that each included the "connect" term.[40] Conversely, on February 5, 2016, Cvent filed a federal trademark application for the mark "CVENT CONNECT."[41] On February 8, 2016, Cvent filed

---

[33]   ECF 170, ¶ 101 (SEALED).

[34]   *Id.* ¶ 102.

[35]   *Id.* ¶ 99.

[36]   *Id.* ¶¶ 103, 105.

[37]   *Id.* ¶ 104.

[38]   *Id.* ¶ 8.

[39]   ECF 159-2, ¶ 124 (SEALED).

[40]   *Id.*

[41]   *Id.* ¶ 88.

a federal trademark application for the "CVENT CONNECT" design mark.[42] The USPTO did not cite to or reference Tarsus during its prosecution of Cvent's marks.[43] Tarsus did not contest either of Cvent's applications.[44]

In late-2016, Tarsus Group, PLC acquired Collinson & Company.[45] After the acquisition, the company's legal name changed to "Tarsus Connect, LLC."[46] On June 27, 2017, the USPTO approved Cvent's applications for trademark rights in "CVENT CONNECT" and placed the marks on the principal register.[47]

On December 14, 2017, Tarsus initiated this action, alleging five counts against Cvent for: federal trademark infringement (Count I); false designation of origin and unfair competition (Count II); Georgia common law trademark infringement and unfair competition (Count III); unfair and captive trade practices (Count VI); and trademark dilution (Count V).[48] On April 16, 2018, Cvent filed its Answer and asserted four counterclaims against Tarsus for: declaratory judgment

---

[42]   *Id.*

[43]   *Id.* ¶ 89.

[44]   *Id.*

[45]   ECF 170, ¶ 10 (SEALED).

[46]   *Id.*

[47]   ECF 159-2, ¶ 88 (SEALED).

[48]   ECF 1.

(Counts I, II, and III) and an alternative claim for federal trademark infringement (Count IV).[49] Tarsus filed its Amended Complaint on May 7, 2018, adding a Georgia law claim for unfair competition and encroachment (Count VI) and a claim under 15 U.S.C. § 1119 seeking the cancellation of Cvent's federally registered trademark (Count VII).[50]

On January 22, 2019, Cvent filed a motion for summary judgment on Tarsus' claims and its own counterclaims.[51] Pursuant to the Court's October 22, 2019 Order,[52] Tarsus filed a combined brief in opposition to Cvent's motion for summary judgment and partially seeking summary judgment on its claims.[53] With the Court's leave, Tarsus filed a corrected, combined brief on November 13, 2019.[54] On November 26, 2019, Cvent filed its combined response in opposition to Tarsus' motion for partial summary judgment and reply in support of its motion for summary judgment.[55] Tarsus filed its reply in support of its motion for partial

---

[49] ECF 15.

[50] ECF 21.

[51] ECF 71.

[52] ECF 148.

[53] ECF 149.

[54] ECF 164 (SEALED).

[55] ECF 167 (SEALED).

summary judgment on December 5, 2019.[56] On February 6, 2020, the Court heard oral argument from the parties on the motions.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary" are not material. *Id*. A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id*. at 324. The non-movant "may not rest upon the mere allegations or denials of his

---

[56]   ECF 179 (SEALED).

pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. If the evidence relied on by the non-movant is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255. *See also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and cannot be made by the district court. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See also Anderson*, 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

## III. TARSUS' CLAIMS

Cvent contends it is entitled to summary judgment on all of Tarsus' claims. Tarsus, conversely, requests summary judgment only on Counts I-VII of its Complaint. The Court addresses each count separately.

### A. Registered Trademark Infringement: § 32 of the Lanham Act, 15 U.S.C. § 1114(a) (Count I)

A trademark is "any word, name, symbol or device, or any combination thereof used to identify and distinguish one's goods from those manufactured or sold by others and to indicate the source of the goods." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1216 (11th Cir. 2000) (*citing* 15 U.S.C. § 1127). Section 32 of the Lanham Act, 15 U.S.C. § 1114(a), "creates a cause of action for the infringement of a registered mark." *Tana v. Dantanna's*, 611 F.3d 767, 773 n.5 (11th Cir. 2010). Pursuant to § 1114(a):

> (1) Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

To prevail on a claim under § 1114(a), Tarsus must show: (1) its mark is valid, and (2) Cvent's use of the mark is likely to cause confusion. *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989).

### i. Tarsus and Cvent Have Federally Registered, Presumptively Valid Trademarks.

Federally registered trademarks are considered presumptively valid. 15 U.S.C. § 1115(a). *See also Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1562 (11th Cir. 1991); *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184–85 (5th Cir. 1980). As stated above, on December 4, 2012, the USPTO issued Tarsus trademark rights in "CONNECT MARKETPLACE."[57] Conversely, on March 5, 2013, the USPTO issued Tarsus a final rejection on its application for trademark protection in "CONNECT."[58] Tarsus did not appeal this rejection and abandoned the trademark application.[59] On June 27, 2017, the USPTO issued Cvent trademark rights in "CVENT CONNECT."[60]

---

[57]   ECF 170, ¶ 66 (SEALED).

[58]   *Id*. ¶ 68.

[59]   *Id*. ¶ 69.

[60]   ECF 159-2, ¶ 88 (SEALED).

Therefore, Tarsus has a presumptively valid mark in "CONNECT MARKETPLACE" — but not "CONNECT" — and Cvent has a presumptively valid mark in "CVENT CONNECT."

### ii. Likelihood of Confusion Between "CONNECT MARKETPLACE" and "CVENT CONNECT"

The Eleventh Circuit has established a multi-factor test to evaluate the likelihood of confusion between two marks:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Tana*, 611 F.3d at 774–75 (*citing Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007)).

Among the seven factors, "the type of mark and the evidence of actual confusion are the most important." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1201 n.22 (11th Cir. 2001) (*citing Dieter*, 880 F.2d at 326). The Court must evaluate and weigh these factors to determine "whether consumers are likely

to confuse the defendant's services with the plaintiff's services." *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 840 (11th Cir. 1983).

### 1.    Strength of Mark

"The strength of a trademark is essentially a consideration of distinctiveness." *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1310 (N.D. Ga. 2008). The Eleventh Circuit has recognized four categories of distinctiveness:

> (1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks.

*Tana*, 611 F.3d at 774 (*citing Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797–98 (11th Cir. 2003)).

These categories are "based on the relationship between the name and the service or good it describes." *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) (*citing John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 (11th Cir. 1983)). The stronger (*i.e.*, more distinctive) the mark, "the greater

the scope of protection accorded it, [and] the weaker the mark, the less trademark protection it receives." *Frehling*, 192 F.3d at 1335.

The two strongest types of marks—arbitrary and suggestive—are deemed "inherently distinctive because their intrinsic nature serves to identify a particular source of a product and are generally entitled to trademark protection." *Id.* (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).[61] A descriptive mark, by contrast, "describes not the basic nature or class of a good or service, but a particular characteristic or quality of it." *Reinalt-Thomas Corp. v. Mavis Tire Supply, LLC*, 391 F. Supp. 3d 1261, 1268 (N.D. Ga. 2019). Such marks are not inherently distinctive.[62] A descriptive mark can, however, "become sufficiently distinctive to enjoy trademark protection by acquiring secondary meaning." *Tana*, 611 F.3d at 774. A descriptive mark acquires "secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer." *Id.* (citing *Welding Servs.*, 509 F.3d at 1358). *See also Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 189 (11th Cir. 2005)

---

[61]  For example, the term "Kodak" is arbitrary as it relates to cameras, and the term "penguin" is suggestive if used as a trademark for refrigerators. *Soweco*, 617 F.2d at 1183–84.

[62]  Examples of descriptive marks include "Vision Center" in reference to a place where one purchases eyeglasses, or "EVERREADY" with reference to batteries or light bulbs. *Soweco*, 617 F.2d at 1183–84 (citations omitted).

("[S]econdary meaning is the connection in the consumer's mind between the mark and the user of the mark.").

A generic mark is a "term by which the product or service itself is *commonly known*." *Welding Servs.*, 509 F.3d at 1358 (emphasis in original). Put another way, a generic mark may "depict[ ] the product or service as a whole, rather than any particular feature, quality, or characteristic of the whole." *Id*. A generic mark is not based on the term itself, but in the specific use of the term: "[A] word may be generic of some things and not of others: 'ivory' is generic of elephant tusks but arbitrary as applied to soap." *Soweco*, 617 F.2d at 1183.[63] Generic marks are the weakest type and "generally incapable of receiving trademark protection and may never be registered as trademarks under the Lanham Act." *Tana*, 611 F.3d at 774 (*citing Welding Servs.*, 509 F.3d at 1358). *See also Soweco*, 617 F.2d at 1183 ("A generic term can never become a trademark."). A generic mark can never achieve a secondary meaning. *Welding Servs.*, 509 F.3d at 1358. *See also Reinalt-Thomas*, 391 F. Supp. 3d at 1268 ("[G]eneric terms are considered in the public domain and

---

[63]   An example of a generic term is "Welding Services" when used to describe a business that provides "weld metal overlay services and fabrications." *Welding Servs.*, 509 F.3d at 1359 (internal punctuation omitted).

cannot be appropriated. Even if a generic term becomes associated primarily with a single company, it cannot achieve trademark protection.") (citations omitted).

As a matter of law, the "CONNECT MARKETPLACE" mark is incontestable and, at a minimum, descriptive with a secondary meaning. *Dieter*, 880 F.2d at 329 (holding incontestable federally registered mark is "presumed to be at least descriptive with secondary meaning"). This imbues it with the presumption of a "relatively strong mark." *Id*. However, a mark's incontestable designation or federal registration "does not mean that a mark's strength cannot be attacked." *Trilink*, 583 F. Supp. 2d at 1312. Instead, such status is "simply one piece of the overall determination of a mark's strength." *Id. See also Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1257 (11th Cir. 2016) (finding defendant successfully "rebutted the presumption of strength by showing extensive third-party use of the mark"). Tarsus argues "CONNECT MARKETPLACE" is entitled to enhanced protection as an arbitrary or suggestive mark. The Court does not agree.

Cvent presents evidence that "CONNECT MARKETPLACE" is a descriptive mark because it describes a precise characteristic and quality of the trade show industry—*i.e.*, the act of joining consumers at a common location. Unlike an arbitrary mark, "CONNECT MARKETPLACE" bears a close and logical

relationship to Tarsus' product. This relationship is self-evident from Tarsus' use of the mark itself and it does not require a leap of the imagination from a prospective customer.

Contrary to Tarsus' characterization, "probative of the descriptiveness of a mark is the idea that is conveyed to the observer by the plain dictionary definition of the formatives comprising the mark." *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1523 (11th Cir. 1991). In *Investacorp*, the Eleventh Circuit held:

> In this case, the two formatives combined in the term "Investacorp" literally convey to the observer that appellant is in the business of investing in corporations. Because the customer who observes the term can readily perceive the nature of plaintiff's services, without having to exercise his imagination, the term cannot be considered a suggestive term. The only remaining categorization that is eligible for protection is the descriptive category. Accordingly, "Investacorp" must be merely descriptive.

*Id.*

In support of its argument, Cvent points to the dictionary definitions of both "connect" and "marketplace." "Connect" may be defined as: (1) "to become joined"; (2) "to have to establish a rapport"; or (3) "to join or fasten together usually

by something intervening."[64] "Marketplace" may be defined as "an open square or place . . . where markets or public sales are held."[65] Like the word "Investacorp," the dictionary definitions of these terms literally convey to the public a basic quality inherent in Tarsus' services: the act of joining meeting planners with suppliers at a market-style trade show.[66] This comports with Tarsus' own characterization of its business.[67] Like "liquor store" used in connection with the sale of liquor, or "vision center" used in reference to a place where one purchases eyeglasses, "CONNECT MARKETPLACE" describes a particular characteristic of the trade show industry. *See Frehling*, 192 F.3d at 1335; *Soweco*, 617 F.2d at 1183–84. This is persuasive evidence that "CONNECT MARKETPLACE" is a weaker mark. *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, No. 1:04-cv-1082-TWT, 2005 WL 8154528, at *7 (N.D. Ga. Sept. 14, 2005) ("A dictionary definition is also probative of the descriptiveness of a mark . . . the phrase 'rug gripper' literally

---

[64]   ECF 71-1, at 18 (citing *Webster's Ninth New Collegiate Dictionary*, at 278 (1985)).

[65]   ECF 71-1, at 18 (*citing Webster's Ninth New Collegiate Dictionary*, at 728 (1985)).

[66]   ECF 71-1, at 18 (*citing Webster's Ninth New Collegiate Dictionary*, at 278, 728 (1985)).

[67]   ECF 71-5 (Collinson Dep. Tr. 119:11–120:12); ECF 71-3 (Ezelle Dep. Tr. 142:4–24).

conveys to the consumer that Optimum's product is used to hold rugs firmly in place, indicating that the mark is merely descriptive.").

The narrow nature of Tarsus' mark is also apparent from the evidence showing that other companies make considerable use of similar marks. "[I]mportant in gauging the strength of a mark is the degree to which third parties make use of the mark." *Frehling*, 192 F.3d at 1336 (*citing John H. Harland Co.*, 711 F.2d at 974–75). "The less that third parties use the mark, the stronger it is, and the more protection it deserves." *Frehling*, 192 F.3d at 1336.

After the USPTO Examiner's first rejection of Tarsus' application for trademark rights in "CONNECT," Tarsus expressly stated that the use of the term "connect" represents a "crowded field."[68] Tarsus posited that over 1,000 active registrations used the term "connect."[69] Cvent points to numerous instances of companies in the meetings and trade shows industry using the term "connect."[70] When a term like "connect" is heavily used and indispensable to an industry, a mark that embraces the term has diminished strength. *Investacorp*, 931 F.2d at 1523

---

[68]   ECF 71-18, at 38.

[69]   *Id*.

[70]   ECF 167, at 14; ECF 170, ¶ 121. *See also* ECF 71-19 (Ghoorah Dep. Tr. 240:6–241:2; 295:6–296:11).

("Over eighty competing broker-dealers use the word 'invest' in their mark, and there are a handful of businesses who use some combination of the formatives 'invest' and 'corp' in their mark. We find the popularity of use by competitors is extreme."). *See also* 2 J. McCarthy, *Trademarks and Unfair Competition*, § 11:85 (5th ed. 2017) ("In a crowded field of look-alike marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd."). Since "CONNECT MARKETPLACE" operates in a "crowded field," the mark's strength is weakened.

The Court also notes that the USPTO issued the "CVENT CONNECT" mark—which is not incontestable but entitled to a presumption of validity— without citing or referring to "CONNECT MARKETPLACE." *Superior Consulting Servs., Inc. v. Shaklee Corp.*, 710 F. App'x 850, 854 (11th Cir. 2017) ("A mark's registration with the USPTO creates a rebuttable presumption of distinctiveness.") (*citing* 15 U.S.C. § 1057(b)). However, as Tarsus notes, the record does not indicate whether the USPTO actually found Tarsus' mark during its due diligence search in conjunction with the Cvent application. Thus, the Court will consider the USPTO's decision, but does not afford it deference or substantial weight. *Investacorp*, 931 F.2d at 1524 ("Although we will bestow proper respect to the determinations of the PTO, we will not defer to an ethereal determination that is

not affirmatively stated by the administrative agency."). *See also Carling Brewing Co. v. Philip Morris, Inc.*, 277 F. Supp. 326, 333 (N.D. Ga. 1967) ("While the various Patent Office decisions referred to are not binding upon this court, they are certainly entitled to the most respectful consideration because of the Patent Office's day-to-day expertise in adjudicating cases wherein the ultimate question decided is the question of 'likelihood of confusion.'").

Tarsus argues that its uses of the term "connect" enhance and broaden the scope of its mark. Tarsus points the Court to its efforts to promote and sell different products embracing the "connect" term.[71] Tarsus also contends its customers publicly refer to its tradeshows as "CONNECT Marketplace" or a "CONNECT Show."[72]

At the outset, Tarsus' attempt to broaden the scope of its "CONNECT MARKETPLACE" mark by focusing on the word "connect" in isolation is improper. The Eleventh Circuit has made clear that the strength and validity of a mark "is determined by viewing the trademark as a whole," not words in isolation. *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 362–63 (11th Cir. 1997).

---

71    ECF 159-60, at 26 (SEALED).

72    ECF 179, at 7 (SEALED).

The evidence pointed to by Tarsus only bolsters the conclusion that "CONNECT MARKETPLACE" is a descriptive mark that has attained secondary meaning. The evidence shows the significance of "CONNECT MARKETPLACE" is the link it makes in the consumer's mind between Tarsus' precise event and the trade show industry.[73] The primary significance of the term is not Tarsus' product itself—which is not revolutionary in the industry—but the annual "CONNECT Marketplace" event.[74]

Therefore, the Court finds that "CONNECT MARKETPLACE" is a descriptive mark with a secondary meaning. However, the mark is "relatively weak" and only "entitled to a narrow range of protection." *Fla. Int'l Univ. Bd. of Trustees*, 830 F.3d at 1260. As such, the Court affords the mark the minimum level of strength entitled to a federally registered mark.

### 2.    Similarity of Marks

For the second factor, the Court "compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling*, 192 F.3d at 1337. "The greater the similarity, the greater the likelihood of confusion." *Fla. Int'l Univ. Bd. of Trustees*,

---

[73]   *E.g.*, ECF 149-6; ECF 151-13; ECF 151-14; ECF 151-15; ECF 151-16; ECF 154-5.

[74]   *Id*.

830 F.3d at 1260. The mere fact that two marks contain the same word does not, in itself, make the marks "substantially similar." *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 502 (5th Cir. 1979). *See also Nautilus Grp., Inc. v. Savvier, Inc.*, 427 F. Supp. 2d 990, 996 (W.D. Wash. 2006) (holding marks "Boflex" and "BodyFlex" are sufficiently dissimilar despite use of common suffix). Instead, a mark must be "viewed in its entirety and in context," as it is "the overall impression that counts." *Armstrong*, 597 F.2d at 502. *See also Fla. Int'l Univ. Bd. of Trustees*, 830 F.3d at 1260 ("We consider the overall impression created by the marks, and do not simply compare isolated features.").

Cvent and Tarsus' marks both use the root term "connect." This is not, however, dispositive. As further explained below, the word "connect" in isolation is a generic term that any company is free to appropriate.[75] Linguistically, the two marks employ "connect" in a different order, and the marks have a substantially dissimilar cadence and appearance. Most importantly, Cvent's mark is prefaced with its unique brand identifier: "CVENT." This is wholly distinct from Tarsus' mark, which is appended with its brand identifier: "MARKETPLACE." On their faces, a prospective customer would immediately be able to distinguish between

---

[75] *Infra* at Section III.B.i.2.a.

the two marks. Tarsus has never used the "CVENT" brand and Cvent has never used the "MARKETPLACE" brand. Beyond the mere inclusion of a generic word, there is simply no evidence these marks are similar.

Moreover, as stated above, the term "connect" operates in a crowded field. "If a trademark operates in a crowded field of similar marks on similar goods or services, slight differences in names may be meaningful because consumers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *Fla. Int'l Univ. Bd. of Trustees*, 830 F.3d at 1260 (citing 2 *Trademarks and Unfair Competition*, § 11:85). Since the marks at issue here operate in a crowded field, the differing placement of "connect" and the inclusion of brand modifiers are sufficient to differentiate the marks. Thus, this factor weighs against a finding of a likelihood of confusion.

### 3.   Similarity of Products and Services Offered

The third factor "requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling*, 192 F.3d at 1338. Put another way, the inquiry is "whether the goods are so related in the minds of consumers that they get the sense that a single

producer is likely to put out both goods." *ITT Corp. v. Xylem Grp., LLC*, 963 F. Supp. 2d 1309, 1321 (N.D. Ga. 2013).

The record demonstrates that, while both parties are active in the meetings industry, their products and customers are not homogenous and are sufficiently distinct. Cvent presents evidence that much of its business is geared towards the software industry. While a portion of Cvent's "CVENT CONNECT" user conference includes a networking event, the overall purpose is to provide continuing education to customers who have already purchased the software on the technology, or prospective customers in the market for software products. Eric Eden, Cvent's corporate representative, testified that "the goal of the conference was ultimately to sell people our software, not necessarily make revenue from the conference itself."[76] Chuck Ghoorah, another Cvent corporate representative, testified that Cvent is a "software company" that conducts user conferences for the "primary purpose [ ] to evangelize and talk about our technology and train our technology."[77]  According to Ghoorah, the networking portion of Cvent's user conference is a small aspect of this event, and the "main reason for our show is to showcase the technology" and sell more software

---

[76]   ECF 71-21 (Eden Dep. Tr. 129:1–3). *See also id.* at 134:12–135:22; 152:12–33.

[77]   ECF 71-23 (Ghoorah Dep. Tr. 253:10–14).

products.[78] Ghoorah concluded that Cvent is "not a trade show."[79] Even Collinson, Tarsus' President, stated his impression from the market is that Cvent's business focuses, at least in part, on selling software products and registration to people who plan meetings and events.[80]

Tarsus concedes it is "not a software company" and does not offer software products.[81] Instead, Tarsus only competes with Cvent "through their division that works with suppliers on selling them solutions through advertising and marketing to [get] more business," (*i.e.*, a small subset of the "CVENT CONNECT" event).[82] Tarsus provides a bevy of evidence highlighting all the areas in which it promotes and offers its user conferences and trade shows. None of these are related to the software industry. Instead, Tarsus is best characterized as a media company. Since Tarsus has no software offerings, a consumer would not attribute both businesses to one source and could easily differentiate between the respective products. Thus, this factor weighs against a finding of a likelihood of confusion.

---

[78]   *Id*. at 86:15–22.

[79]   *Id*. at 253:10–14.

[80]   ECF 71-5 (Collinson Dep. Tr. 53:8–55:15–24).

[81]   *Id*. at 57:6-10; ECF 72-4 (Ezelle Dep. Tr. 66:13–14).

[82]   ECF 71-5 (Collinson Dep. Tr. 57:6–17).

### 4.     Similarity of Sales and Advertising Methods

The fourth factor "takes into consideration where, how, and to whom the parties' products are sold." *Frehling*, 192 F.3d at 1339. While evidence of "[d]irect competition between the parties is not required for this factor to weigh in favor of a likelihood of confusion" and the "parties' outlets and customer bases need not be identical . . . some degree of overlap should be present." *Id.*

Tarsus and Cvent advertise regionally and nationally through online websites, social media, direct communications (*e.g.*, by phone or in person), and print publications. This alone is not dispositive, however, as the advertisements are targeted to different types of customers. Cvent gears its advertisements towards current and prospective customers of its software products.[83] Tarsus' advertisements for its "reverse style" trade shows, conversely, are targeted to meeting planners and suppliers. While they advertise through similar media—as do many other companies—Cvent presents evidence that the types of people Tarsus targets are not the same people who would purchase services from Cvent.[84]

---

[83]   ECF 71-22 (Smith Dep. Tr. 48:19–51:9; 64:11–18; 68:3–21); ECF 71-23 (Ghoorah Dep. Tr. 141:4–13).

[84]   ECF 71-21 (Eden Dep. Tr. 213:25–214:10).

Cvent also presents evidence that the parties' respective customer bases represent highly sophisticated consumers. For example, prospective attendees of a Tarsus show are required to expend a significant amount of money up-front just to participate.[85] Prior to a show, prospective attendees must work closely with Tarsus so it can correctly match each supplier to an appropriate meeting planner at the show.[86] In fact, Tarsus screens attendees to ensure only certain customers are selected to participate.[87] There is no evidence Cvent engages in such a rigorous pre-show selection process. For its part, Tarsus agrees the parties advertise to "professional customers."[88] Given this sophistication—and the level at which Tarsus engages prospective customers prior to a trade show—there is a significantly lower concern of a likelihood of confusion. *Fla. Int'l Univ. Bd. of Trustees*, 830 F.3d at 1256. *See also Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985) ("The sophistication of a buyer certainly bears on the possibility that he or she will become confused by similar marks."). Thus, this factor weighs against a finding of a likelihood of confusion.

---

[85]   ECF 72-15 (SEALED); ECF 159-2, ¶ 58 (SEALED).

[86]   ECF 159-2, ¶¶ 54–58 (SEALED).

[87]   ECF 71-6 (Ezelle Dep. Tr. 95:6–9).

[88]   ECF 159-60, at 33 (SEALED).

### 5.    Intent to Misappropriate Good Will

For the fifth factor, Tarsus must show Cvent adopted "CVENT CONNECT" with the intention of deriving a benefit from Tarsus' business reputation, or that Cvent acted with intentional blindness to potential confusion between the parties' marks. *Trilink Saw Chain*, 583 F. Supp. 2d at 1317 (*citing Frehling*, 192 F.3d at 1340). Tarsus does not argue Cvent acted with "intentional blindness" in adopting and using the "CVENT CONNECT" mark. Instead, Tarsus argues Cvent had "direct access to Tarsus' CONNECT Marks and the goods and services offered under those marks," including Tarsus' alleged success with the marks.[89]

Tarsus presents evidence showing the parties maintained a business relationship from at least 2012 through 2015.[90] This included, among other things: (1) the parties executing two contracts involving Tarsus' events; (2) Cvent sending representatives to Tarsus' shows, including "CONNECT MARKETPLACE"; and (3) Cvent becoming a sponsor of Tarsus' trade show events.[91] Tarsus also points to evidence showing that, when Cvent decided to combine its user conferences into one event, it considered a variety of names in its rebranding efforts.

---

[89]   ECF 159-60, at 34 (SEALED).

[90]   *Supra* at 6–7.

[91]   *Id*.

Specifically, Cvent considered "CVENT CONNECT" as a possible name. At least one member of Cvent's senior management knew that Tarsus used the term "connect" in its business.[92] One Cvent employee also questioned whether there would be confusion between "CVENT CONNECT" and "CONNECT MARKETPLACE."[93]

In sum, Tarsus does not present any evidence that Cvent adopted its mark with the *intent* of deriving a benefit from Tarsus' business. However, the record certainly demonstrates that Cvent had knowledge of Tarsus' business and use of the "CONNECT MARKETPLACE" mark. Cvent also knew of at least the potential for confusion between the two marks. While knowledge alone does not equate to bad faith, this factor weighs in favor of finding a likelihood of confusion. *Superior Consulting*, 710 F. App'x at 858.

### 6.    Existence and Extent of Actual Confusion

The Court's inquiry of the sixth factor, concerning the existence and extent of actual confusion, "turns on both the number of instances of confusion and the type of person confused." *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1167 (11th Cir. 2019). There is no "absolute scale" for assessing whether there is

---

[92]    ECF 159-28 (SEALED).

[93]    ECF 159-37 (SEALED).

actual confusion among consumers; rather, the district court must "examin[e] the evidence in light of the circumstances of the particular case." *Jellibeans*, 716 F.2d at 844.  Notwithstanding such inquiries, the "greater the number of identical or more or less similar trademarks already in use . . . the less is the likelihood of confusion." *John H. Harland Co.*, 711 F.2d at 974.

Tarsus alleges it "has experienced, and continues to experience, customer confusion" regarding the "CONNECT MARETPLACE" and "CVENT CONNECT" marks.[94] Tarsus contends it has "received many reports of instances of actual confusion via email, phone calls, and in-person interactions."[95] Tarsus points to at least 25 instances of alleged confusion between the two marks.[96] This evidence includes misdirected inquiries from actual and prospective customers.[97]

However, the timing of these instances of alleged confusion is notable. Cvent adopted the "CVENT CONNECT" mark on January 22, 2015. On January 11, 2016, Tarsus changed its name from "Collinson & Company" to "Tarsus Connect." Tarsus does not present any evidence of actual confusion among the

---

[94]   ECF 159-1, ¶ 175 (SEALED).

[95]   *Id.*

[96]   *Id.* ¶ 176.

[97]   *Id.*

two marks between January 2015 and January 2016. The lack of evidence showing any actual confusion during this period of concurrent use is probative. *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1362 (11th Cir. 2019) ("If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion."). *See also Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 490 (1st Cir. 1981) ("[A]bsent evidence of actual confusion, when the marks have been in the same market, side by side, for a substantial period of time, there is a strong presumption that there is little likelihood of confusion."); *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) (holding concurrent use in market for 17 months with no actual confusion is "highly significant"); 4 *Trademarks and Unfair Competition*, § 23:18 ("Proof that for a long period of concurrent use of the marks, there was no actual confusion between them has been regarded as relevant evidence.").

Instead, all of Tarsus' evidence concerns testimonials between January 30, 2017 through January 10, 2019—a year *after* Tarsus had changed its name to adopt

the "connect" term.[98] Based on the record, it appears the two brands existed harmoniously during that period without any confusion, and any confusion caused thereafter may be attributable to Tarsus' decision to change its name to adopt the "connect" moniker. This diminishes the strength of Tarsus' evidence, as courts have expressly "rejected anecdotal evidence of actual confusion when the proponent did not show that a misleading representation by the defendant, as opposed to some other source, caused a likelihood of confusion." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017) (internal punctuation omitted); *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 296 (S.D.N.Y. 2018) ("Undoubtedly, the evidence . . . reveal[s] the existence of some limited confusion, however the record does not support linking those isolated instances of confusion to the [defendant's] at-issue behaviors.").

At bottom, Tarsus' evidence shows various instances of customers mistaking the two marks since January 30, 2017. Thus, there is at least some degree of actual confusion that weighs in Tarsus' favor. The Court must treat this as a factor in its consideration. *See Davis v. Walt Disney Co.*, 430 F.3d 901, 905 (8th Cir.

---

[98]   *Id*. ¶ 176.

2005) ("Though evidence of actual confusion may be the best evidence of likelihood of confusion, it is not conclusive of its existence."). Tarsus' evidence is insufficient to create a triable issue of fact because its timing, as discussed above, provides a "reasonable explanation discounting isolated instances of confusion." 4 *Trademarks and Unfair Competition*, § 23:13.

Viewing the record as a whole, the Court concludes the factors in the 'likelihood of confusion' test weigh in favor of Cvent. Therefore, Tarsus has failed to demonstrate a likelihood of confusion between the "CONNECT MARKETPLACE" and "CVENT CONNECT" marks. Cvent is entitled to summary judgment on Tarsus's claim under 15 U.S.C. § 1114(a) (Count I).

## B. False Designation of Origin and Unfair Competition: § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), "protects qualifying unregistered trademarks." *Tana*, 611 F.3d at 773 n.5 (*citing Two Pesos*, 505 U.S. at 768). To establish a prima facie case under § 1125(a)(1), Tarsus must show "(1) that it had prior rights to the mark at issue and (2) that the defendant had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Planetary Motion*, 261 F.3d at 1193 (*citing Lone Star Steakhouse & Saloon*, 106 F.3d at 360). *See also Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 992–93 (2d Cir. 1987) ("We have developed a two-

step test for determining whether an unregistered mark has been infringed. First, a plaintiff must demonstrate that his mark merits protection under the Lanham Act. Then, if the mark is protectible, the plaintiff must establish the likelihood of confusion, that is, that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.").

### i.     Tarsus Does Not Have Protectable Trademark Rights in the Word "Connect."

Unlike § 1114(a), a cause of action under § 1125(a) does not require a federally registered trademark. Instead, to establish the first element—proof of a protectable mark:

> [T]he use of another's unregistered, *i.e.*, common law, trademark can constitute a violation of [§ 1125(a)] where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source.

*Tana*, 611 F.3d at 773 (*citing Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512–13 (11th Cir. 1984)).

To acquire common law trademark rights, Tarsus must show it is "(1) the prior user of the unregistered mark and (2) it acquired a protectable interest in the mark because the mark is either inherently distinctive or has

acquired distinctiveness through a secondary meaning." *Cathedral Art Metal Co. v. Divinity Boutique*, LLC, No. 1:18-cv-141-WSD, 2018 WL 566510, at *5 (N.D. Ga. Jan. 26, 2018) (*citing Investacorp*, 931 F.2d at 1522–23). *See also Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1131 (11th Cir. 2018) ("Common-law trademark rights are initially acquired through priority of appropriation.").

Tarsus asserts "connect" is a trade name in which it has acquired common-law trademark rights through its family of products. Indeed, Tarsus claims it has "common law rights in all of its CONNECT Marks."[99] Tarsus contends Cvent is unlawfully infringing on those common law rights by using "connect" in conjunction with its "CVENT CONNECT" user conference.

### a.   Tarsus Has Established Priority of Use.

Under § 1125, common law trademark rights "are appropriated only through actual prior use in commerce." *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1989). "The first to use a mark on a product or service in a particular geographic market, the senior user, acquires rights in the mark in that market." *Id*. at 1023.

---

[99]   ECF 164-1, at 16 (SEALED).

While Tarsus has never used "connect" in isolation, Tarsus presents evidence that it has used the term "in conjunction with its other products since as early as 2009.[100] For example, Tarsus published the "Connect Meetings Intelligence" magazine and hosted the first "CONNECT Marketplace" tradeshow in 2009.[101] Cvent, on the other hand, did not use "connect" until 2014, at the earliest.[102] Both parties have since used the term regionally and nationwide. Thus, based on the record, Tarsus has priority of usage over the mark.

### b.   Tarsus Does Not Have Protectable Rights in the Mark.

Unlike its claim under § 1114(a), Tarsus does not enjoy a presumption of validity or descriptiveness in "connect" for its common law claim. *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004) ("[I]t is [plaintiff's] burden to demonstrate that [the allegedly infringed mark] is protectable under § 43(a)."); *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 217 (2d Cir. 2003) ("Because [plaintiff's] mark is unregistered, however, the burden is on the plaintiff to prove the mark is . . . valid and to show that the composite mark is not generic.") (internal punctuation and citation omitted). *See also* 5 *Trademarks and Unfair*

---

[100]   ECF 159-2, ¶ 23 (SEALED); ECF 170, ¶¶ 5, 11 (SEALED).

[101]   ECF 170, ¶¶ 11, 19 (SEALED).

[102]   ECF 159-2, ¶ 77 (SEALED).

*Competition*, § 27:14 ("[I]n suing under § 43(a) for infringement of an unregistered trademark, plaintiff must prove both validity and infringement, unaided by any presumptions.").

Common law rights are limited only to "those marks that are capable of distinguishing the owner's goods from those of others, *i.e.*, that are sufficiently 'distinctive,' are eligible for federal registration or protection as common law marks under the Lanham Act." *Tana*, 611 F.3d at 773 (*citing* 15 U.S.C. § 1052(e), (f)). *See also Donchez*, 392 F.3d at 1216 ("To be protectable, a mark must be capable of distinguishing the products or services it marks from those of others.") (internal punctuation omitted). If a plaintiff asserts the infringement of a common law trademark, a court "may not reach the question of likelihood of confusion until persuaded that the putative mark is sufficiently distinctive to warrant protection." *Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360, 1367 (N.D. Ga. 2010). *See also Optimum Techs.*, 2005 WL 8154528, at *6 ("Before addressing whether HCA's use of the RUG GRIPPER mark was likely to cause confusion, the Court must determine whether Optimum has a protectable interest in the RUG GRIPPER mark."). Common law trademarks are classified into the same four distinctiveness categories used to determine a mark's strength: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary.

Cvent argues "connect" is weak and properly classified as generic.[103] Tarsus counters that "connect" is inherently distinctive because it is arbitrary, or at a minimum, suggestive.[104] Tarsus further contends that, if the mark is classified as merely descriptive, Tarsus has established a secondary meaning.[105]

### (i)   "Connect" Is a Generic Mark

Without the benefit of any presumption, the Court finds that Tarsus does not have a protectable interest in the "connect" mark. Based on the record, the mark is most accurately classified as generic. "Connect" is not distinctive and describes the basic nature of Tarsus' services as a whole—connecting prospective and actual customers at trade shows. As Cvent points out, the dictionary definition of "connect" supports this conclusion.[106] Moreover, the mark is commonly used to describe the type of product (*i.e.*, trade shows) offered in the industry. Indeed, third parties in the industry make extensive use of the word "connect," which is a key factor in determining its distinctiveness. *Sandshaker Lounge & Package Store LLC v. Quietwater Entm't Inc.*, 602 F. App'x 784, 787 (11th Cir. 2015) (holding term

---

[103]   ECF 71-1, at 26.

[104]   ECF 164-1, at 13 (SEALED).

[105]   *Id.* at 23–26.

[106]   ECF 71-1, at 11–12.

"BUSHWACKER" is generic mark not entitled to trademark protection because third parties make extensive use of name).

Put another way, "connect" describes the entirety of Tarsus' product line. Courts analyzing similar marks have found them to be merely generic. *E.g.*, *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1321 (11th Cir. 2012) ("Miller's [ ] has no protectable interest in the words 'ale house' because they are generic words for a facility that serves beer and ale, with or without food.") (internal punctuation omitted); *Donchez*, 392 F.3d at 1219 (holding that term "beerman" is generic mark afforded no protectable trademark interest); *Welding Servs.*, 509 F.3d at 1359 (holding that term "Welding Services" is generic mark when used to describe business that provided welded metal overlay services and fabrications).

Because "connect" is a generic mark, Tarsus is not permitted to assert a protectable interest over it. *Freedom Sav. & Loan Assoc.*, 757 F.2d at 1182 n.5 ("Marks that are generic are worthy of no protection whatsoever."). As a generic mark, "connect" cannot attain a secondary meaning. *Reinalt-Thomas*, 391 F. Supp. 3d at 1268 ("[G]eneric terms are considered in the public domain and cannot be appropriated. Even if a generic term becomes associated primarily with

a single company, it cannot achieve trademark protection.") (internal citations omitted). Therefore, Tarsus' claim under § 1125(a) fails.

### (ii) Even if "Connect" Is a Descriptive Mark, Tarsus Has Not Established a Secondary Meaning.

Even if the Court, *arguendo*, considered "connect" a descriptive mark, that does not end the inquiry. *NBA Props., Inc. v. Dahlonega Mint, Inc.*, 41 F. Supp. 2d 1341, 1345 (N.D. Ga. 1998) ("Marks that are descriptive are worthy of protection only if the plaintiff shows that the marks have achieved secondary meaning—the power of a name or other configuration to symbolize a particular business, product or company.") (internal punctuation omitted). Tarsus bears the "burden of sustaining a high degree of proof in establishing a secondary meaning for a descriptive term." *Investacorp*, 931 F.2d at 1525. *See also Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir. 1987) ("A high degree of proof is necessary to establish secondary meaning for a descriptive term which suggests the basic nature of the product or service."). Based on the record, the Court finds Tarsus has not met this heavy burden.

The Eleventh Circuit has identified four factors that are relevant to the secondary meaning inquiry:

> (1) The length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the

> public's mind between the name and the plaintiff's . . .
> business; and (4) the extent to which the public actually
> identifies the name with the plaintiff's service.

*Investacorp*, 931 F.2d at 1525 (internal punctuation omitted). *See also Freeway Ford,*

*Inc. v. Freeway Motors, Inc.*, 512 F. Supp. 2d 1353, 1361 (M.D. Ga. 2007).

Critically, Tarsus must prove its "mark acquired secondary meaning before

the alleged infringement began." *Atlanta Allergy*, 685 F. Supp. 2d at 1368

(*citing Investacorp*, 931 F.2d at 1525) ("[S]econdary meaning must attach to the

mark before appellee first used the mark."). *See also Gift of Learning*, 329 F.3d at 800

("Kids Golf must demonstrate that its mark acquired secondary meaning before

TGC began to use its Drive Chip & Putt trademark on August 4, 1998.")

(*citing* 2 *Trademarks and Unfair Competition*, § 16:34 ("The rule is that the senior user

must prove the existence of a secondary meaning in its designation at the time and

place that the junior user first began use of that mark.").

### (1)  Tarsus' Length and Manner of Use of "Connect"

For the first factor, Tarsus claims that from "2009 until 2014 Tarsus Connect

made substantially exclusive use [of the term] in the business meetings

industry."[107] While Tarsus presents the Court with voluminous editions of its

magazines and publications, Tarsus' use of "connect" is not as broad or exclusive

---

[107]   ECF 159-60, at 23 (SEALED).

as it contends. Notably, Tarsus never used the term "connect" in isolation. The distinction is important: Tarsus cannot assert domain over virtually all uses of the term "connect" when it has never used the term on its own. Instead, the record demonstrates Tarsus has exclusively used "connect" in conjunction with other identifying terms, such as its more distinctive "Marketplace" brand. Tarsus cannot exclude its competitors from using any form of a common term by tacking on its own, more descriptive modifiers.

Also, the record belies Tarsus' proclamation that it has enjoyed exclusive use of "connect" in the industry. As stated above, this is a crowded field. Tarsus concedes there are over 1,000 active registrations utilizing the mark. Many of these are in the meetings and trade show industries. Moreover, as Cvent notes, any argument that Tarsus has made exclusive use of the term "connect" in the meetings industry since 2009 is undermined by the USPTO's recent decision to issue trademark rights to a third party in "connect" as a sole term.[108] In fact, the USPTO found the third party first used the term on March 18, 2009—the same year Tarsus first utilized the term.[109] Tarsus does not dispute the USPTO's findings or

---

[108] ECF 168-19; ECF 168-30.

[109] *Id*.

otherwise point to a material issue of fact in this regard. Therefore, this factor weighs against a finding of a secondary meaning.

### (2)  Nature and Extent of Tarsus' Advertising and Promotion

Tarsus contends it "has advertised both nationally and regionally, spending millions promoting its goods and services under the CONNECT Marks."[110] The Court agrees that Tarsus advertises its products both regionally and nationally. However, Tarsus does not present the Court with any actual evidence showing it has expended money uniquely in its promotion of the "connect" mark. Instead, Tarsus points to Collinson's declaration and Tarsus' financial records for its 2015 through 2018 trade shows.

This evidence is not persuasive. First, it simply lists Tarsus' income and expenses for certain shows during this period. The amount of income Tarsus derived from a trade show is wholly irrelevant to the resolution of this issue. For the expenses, Tarsus' financial records simply list each expense as "overhead." There is no evidence of actual dollars going towards the marketing or promotion of any "Connect" product. Tarsus also does not point the Court to actual evidence

---

[110]  ECF 159-60, at 24 (SEALED).

demonstrating its advertising efforts, whatever they may be, have actually been effective. In short, Tarsus' evidence does not support its conclusion.

Moreover, Tarsus' financial records only list the amount of income and expenses for trade shows that occurred between 2015 and 2018. Collinson concedes that, "[d]ue to a computer system program change, we do not have specific information for previous years."[111] Thus, Tarsus' evidence *only* refers to shows that occurred after January 22, 2015—the date Cvent announced "CVENT CONNECT" and the alleged infringement commenced. Tarsus cannot use evidence that occurred after the alleged infringement began to create an issue of fact regarding a secondary meaning. *Gift of Learning*, 329 F.3d at 800; *Atlanta Allergy*, 685 F. Supp. 2d at 1368. Accordingly, this factor weighs against a finding of a secondary meaning.

### (3)  Tarsus' Efforts to Promote a Conscious Connection in the Public's Mind

Tarsus contends the growth in subscribers and attendees at its trade shows demonstrates that prospective customers in the industry associate the "connect" brand with its particular services.[112] The Court is dubious that crowd sizes and

---

[111]  ECF 159-3, ¶ 52 (SEALED).

[112]  ECF 159-60, at 24 (SEALED).

number of attendees can be an accurate or relevant benchmark for the secondary meaning inquiry. Tarsus cites to no authority embracing such a holding.

However, the Court is persuaded by Tarsus' extensive use of "connect" in conjunction with its other brands. Tarsus presents evidence that, since 2009, it has made substantial efforts to incorporate "connect" into many of its publications and trade shows. As such, the Court finds that Tarsus has made a concerted effort to promote the products it labels with the "connect" moniker.

### (4) Extent to Which Public Actually Identifies "Connect" with Tarsus' Services

Tarsus contends the public identifies "connect" with its goods and services.[113] In support, Tarsus does not provide survey evidence; rather, it points to circumstantial evidence in the form of over 40 purported testimonials from customers commending Tarsus on the success of its various trade shows.[114] Tarsus also cites four "unsolicited" press releases it contends identifies its "Connect Marketplace show" with the meetings industry.[115]

---

[113]  ECF 159-60, at 24-25 (SEALED).

[114]  ECF 154-5.

[115]  ECF 159-60, at 24-25 (SEALED). *See also* ECF 151-13; ECF 151-14; ECF 151-15; ECF 151-16.

However, none of this evidence creates a material issue of fact. All of Tarsus'
evidence concerns events that occurred *after* January 22, 2015—the date Tarsus
alleges the infringement began. The earliest purported testimonial concerned the
2015 Connect Marketplace event, which took place from August 27–29, 2015.[116] All
four news stories are also dated after January 22, 2015.[117] Since this evidence
concerns events after Tarsus alleges the trademark infringement began, it cannot
create an issue of fact on secondary meaning. *Gift of Learning*, 329 F.3d at 800;
*Atlanta Allergy*, 685 F. Supp. 2d at 1368. Therefore, this factor weighs against a
finding of a secondary meaning.

Based on a review of the record in its entirety, Tarsus presents evidence
supporting only one of the four factors identified by the Eleventh Circuit in
*Investacorp*. 931 F.2d at 1525. Tarsus otherwise fails to demonstrate a material issue
of fact. As such, the Court finds Tarsus has failed to carry its heavy burden of
proving a secondary meaning in the term "connect." Simply put, Tarsus has not
put forth sufficient evidence showing "connect" "denotes to the consumer or
purchaser a single thing coming from a single source." *Tartell v. S. Fla. Sinus &
Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015). Without a secondary

---

[116]   ECF 170, ¶¶ 23, 26 (SEALED).

[117]   ECF 151-13; ECF 151-14; ECF 151-15; ECF 151-16.

meaning, Tarsus cannot assert common law trademark protection over the word "connect," even if the Court considers it a descriptive term. *Atlanta Allergy*, 685 F. Supp. 2d at 1368 ("If a mark has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark."). Therefore, Tarsus does not have protectable common law trademark rights in "connect."

Notwithstanding, Tarsus also contends it has established common law trademark rights in the entire "family" of "connect" marks through its various uses of the term "connect."[118] A group of marks may garner trademark protection as a "family" when "the individual marks have a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner." *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, No. 07 CIV. 5804 (GEL), 2009 WL 959775, at *3 (S.D.N.Y. Apr. 8, 2009). However, to prove a family of marks, the family surname must be distinctive. *Id. See also Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 395 (7th Cir. 1992) ("[T]he family feature here is descriptive, and some authorities have even

---

[118]  ECF 159-60, at 25 (SEALED).

stated that descriptive terms cannot constitute the common element in a family of marks. . . . It may be more accurate to say that a descriptive term can serve as a family surname only where there is a strong showing of secondary meaning in the term.”). Based on the record, Tarsus’ use of the term “connect” is not distinctive. Even if the Court considered “connect” a descriptive mark, Tarsus has failed to make a strong showing of a secondary meaning. Thus, Tarsus cannot rely on its various uses of the “connect” term to cobble together a family of marks entitled to a heightened level of protection.

### ii.  There Is No Likelihood of Confusion Between “CONNECT” and “CVENT CONNECT.”

Assuming, *arguendo*, Tarsus has a protectable common law trademark interest in the term “connect,” its claim under § 1125(a) would still fail because Tarsus cannot prove a likelihood of confusion. The likelihood of confusion test is the same for claims under both § 1114(a) and § 1125(a). *Tana*, 611 F.3d at 774, n.5 (*citing Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1503–04 (11th Cir. 1985)). As stated above, Tarsus cannot prove a likelihood of confusion between the federally registered “CONNECT MARKETPLACE” and “CVENT CONNECT” marks. A consideration of the likelihood of confusion between “CONNECT” and “CVENT CONNECT” would involve the same evidence and legal standard the

Court has thoroughly examined above. Thus, the Court finds Tarsus cannot prove a likelihood of confusion between "CONNECT" and "CVENT CONNECT."

Accordingly, Cvent is entitled to summary judgment on Tarsus' claim under 15 U.S.C. § 1125(a) (Count II).

### C. Tarsus' State Law Trademark Infringement Claims (Counts III, IV, and VI)

In addition to its claims under the Lanham Act, Tarsus asserts claims for trademark infringement under Georgia common and statutory law: Common law trademark infringement and unfair competition (Count III); Georgia Deceptive Trade Practices Act (Count IV); and unfair competition and encroachment (Count VI). As Tarsus concedes, each of these claims is dependent on the success of its claims under the Lanham Act, as each claim requires the same analysis. *Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1413 (11th Cir. 1998) ("Georgia's Deceptive Trade Practices Act, O.C.G.A. § 10-1-372, involves the same dispositive question as the Lanham Act claim."); *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1539 (11th Cir. 1985) ("[T]he standards governing most of the claims under Georgia law are similar, if not identical, to those under the Lanham Act."); *Dead End Survival, LLC v. Does 1–3*, No. 1:18-cv-2008-MHC, 2018 WL 6380796, at *6 (N.D. Ga. Oct. 31, 2018) (holding necessary elements to establish encroachment claim "are identical to those required to

prevail on [a] federal Lanham Act infringement claim."); *Stembridge Prod., Inc. v. Gay*, 335 F. Supp. 863, 864 (M.D. Ga. 1971) ("[T]he same test may be applied in determining trademark infringement under the Lanham Act and trademark infringement under the Georgia law.").

As stated above, Tarsus fails to demonstrate the existence of a genuine dispute of material fact regarding a likelihood of confusion between Tarsus' and Cvent's marks. Thus, Tarsus cannot succeed on its Lanham Act claims. Accordingly, Cvent is entitled to summary judgment on Tarsus' state law trademark infringement claims (Counts III, IV, and VI).

### D.  Trademark Dilution (Count V)

Pursuant to O.C.G.A. § 10-1-451(b):

> Every person, association, or union of working men adopting and using a trademark . . . may proceed by action; and all courts having jurisdiction thereof shall grant injunctions to enjoin subsequent use by another of the same or any similar trademark . . . if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the trademark . . . of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.

A mark is not required to be "famous or registered; rather, it is protectable if it is distinctive (either inherently or through secondary meaning)." *Reinalt-Thomas*, 391 F. Supp. 3d at 1281. *Cf.* 4 *Trademarks and Unfair Competition*, § 24:104 ("[I]n order to

be 'famous,' a mark must be widely recognized by the general consuming public of the United States as a designation indicating a single source of goods or services."). Trademark dilution "occurs where the use of the trademark by the subsequent user will lessen the uniqueness of the prior user's mark with the possible future result that a strong mark may become a weak mark." *Reinalt-Thomas*, 391 F. Supp. 3d at 1281.

As stated above, Tarsus is not entitled to any protection in the term "connect." Moreover, "CONNECT MARKETPLACE," while entitled to protection, is not a strong mark. The Court has already found there is not a likelihood of confusion between "CVENT CONNECT" and "CONNECT MARKETPLACE." Instead, the evidence demonstrating that a plethora of third parties make ready use of similar marks undermines any assertion that Tarsus has held exclusivity over the term "connect" in the Georgia market. As such, Cvent is entitled to summary judgment on Tarsus' trademark dilution claim (Count V).

### E.  Cancellation of Cvent's Federally Registered Trademark (Count VII)

In Count VII, Tarsus seeks to cancel Cvent's "CVENT CONNECT" federally registered mark under 15 U.S.C. §§ 1119 and 1064.[119]

---

[119]  ECF 21, ¶ 92.

Section 1119 provides the Court with the "authority to cancel trademarks that the [USPTO] has registered." *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 782 (11th Cir. 2020). The registrant, here Cvent, "enjoys the benefit of a prima facie evidence of the validity of the registration for the goods or services specified in the certificate." *Int'l Mobile Machs. Corp. v. Int'l Tel. & Tel. Corp.*, 800 F.2d 1118, 1120 (Fed. Cir. 1986). To succeed on its claim for the cancellation of a federally registered mark, Tarsus must demonstrate: "(1) that it has standing to petition for cancellation because it is likely to be damaged, and (2) that there are valid grounds for discontinuing registration." *Id.* (*citing Coach House Rest.*, 934 F.2d at 1557 (11th Cir. 1991)). To cancel a federal registration under § 2 of the Lanham Act, Tarsus must prove "that the registered mark is likely to cause confusion when used in connection with the services of registrant." *Id.*

As stated above, Tarsus has failed to prove that Cvent's mark has infringed on either "CONNECT MARKETPLACE" or "CONNECT." As such, Tarsus cannot establish the second element necessary to cancel a registered trademark. Thus, Cvent is entitled to summary judgment on Count VII.

## IV. CVENT'S COUNTERCLAIMS

Cvent also requests summary judgment on each of its four counterclaims. Counterclaim Counts I, II, and III seek declaratory judgments on issues that are

fully resolved in light of this Court's Order. Thus, these counterclaims are moot. Likewise, counterclaim Count IV is an alternative count for federal trademark infringement that would be applicable only if the Court found a likelihood of confusion between Cvent's use of the mark "CVENT CONNECT" and Tarsus' use of the marks "CONNECT MARKETPLACE" or "CONNECT." Since the Court finds there is no likelihood of confusion, counterclaim Count IV is moot. Thus, Cvent's counterclaims must be **DISMISSED** and its motion for summary judgment as to its counterclaims is **DENIED**.

## V.  CONCLUSION

For the foregoing reasons, Cvent's motion for summary judgment [ECF 71] is **GRANTED** as to Tarsus' claims and **DENIED** as to Cvent's counterclaims; Tarsus' motion for partial summary judgment [ECF 149] is **DENIED**. The parties' sealing motions [ECF 160; ECF 197; 199] and motion to redact the oral argument transcript [ECF 197] are **GRANTED**. The Clerk is **DIRECTED** to enter judgment in favor of Cvent and close the case.

**SO ORDERED** this the 2nd day of April 2020.

Steven D. Grimberg
United States District Court Judge